NOBLE *v.* STATE.

Crim. 4057.

Opinion delivered January 24, 1938.

*Jack Holt,* Attorney General, and *John P. Streepey,* Assistant, for appellant.

GRIFFIN SMITH, C. J. Appellant, a negro, was convicted of the crime of murder in the first degree and his punishment was fixed at electrocution. No brief has been filed by appellant, but the record has been abstracted by the Attorney General's assistant; also, the case was orally argued on behalf of appellant by an attorney who did not participate in the trial.

Information against appellant and Willie Turner was filed by the prosecuting attorney, alleging that "The said defendants on the 10th day of April, 1937, in Miller county, Arkansas, did unlawfully, wilfully, feloniously and with malice aforethought, and with premeditation and deliberation, kill and murder Joseph Hawks, a human being, by shooting the said Joseph Hawks with a gun while in the act of attempting to rob the said Joseph Hawks, against the peace and dignity of the state of Arkansas."

Appellant demurred to the information on the following grounds: (1) That the information does not allege sufficient facts to charge the defendant, Willie Noble, with a criminal offense. (2) That the information is fatally defective "in that, if charging a crime at all, it charges two crimes in one count, in that it charges the said defendant with the crime of murder in the first degree alleged to have been committed with malice aforethought, and with premeditation and deliberation, and

then charges such defendant with murder alleged to have been committed while attempting to commit robbery.'' The demurrer was overruled.

Specific objections were made to remarks by the prosecuting attorney, but we do not regard these remarks as having been improper, and, therefore, they were not prejudicial.

Appellant is alleged to have killed Joseph Hawks in the following circumstances: Richard Hawks and Joseph Hawks, brothers, operated a grocery store in Texarkana at the corner of Thirteenth and State Line streets. It was customary for them to go from their residence to the store and return together, the residence being on Twelfth and Beech streets. In making the trips the brothers would travel "a little blind street and just cut across a trail there." On the night of the tragedy the store was closed about 9:30. At a dark place on the blind street the brothers met two men. In telling of the experience, Richard Hawks testified: "One of the men ran a gun up against us hard and said 'stick 'em up and don't move.' He snatched my brother's gun out of his pocket, shot him, and then ran. We could not tell whether they were white or colored men, it was too dark. I thought the voice sounded like a white man. I think there was only one shot. It was the same shot that went through my brother's heart and through my shoulder. My brother knew that he had been shot, but didn't say anything, just walked on until we got near McDonald's house, and he said, 'I am done.' We walked on up to the residence there and he said it again, and staggered. I went to catch him and found out my arm was broken. My brother only lived a few minutes."

John E. Stewart testified that appellant was living at his house when Hawks was killed—about a block from the scene of the tragedy. "Appellant would talk about 'holding up' all the time. He talked about the Hawks brothers and said he thought they had some money— would say this when he saw them passing the house. The day Mr. Hawks was killed I took appellant to the Kress store. He came out of the store and said he had bought

some tape. When I got back home I asked him what he was going to do with the adhesive tape, and he said he was going to put it on his face to look like he had been in a car wreck. That night he called me into his room and showed me two guns lying on the floor. He said he had taken one of them from the old man and had 'hit him a hard lick,' but didn't say he had shot him. I didn't pay much attention to him, just thought he was talking. Finally the guns disappeared. He told me he had taken one of the guns from the old man, but he never did tell me who the old man was that he had the tussle with.''

A pistol was shown the witness, and he said: ''That looks like the gun he had—it was a white handle gun. The gun Chief Davis showed me at the police station right after that happened looks like the same gun. I went with the Chief out to New Town and got the gun at William Whitaker's house. I would know this gun for a certainty.'' Witness said that he did not know Willie Turner.

On redirect examination he said: ''After I heard the ambulance appellant came back to the house in about thirty minutes. That was when he called me to his room. He had the two guns at that time.''

Willie Turner testified: ''I am 33 years old, and my nickname is 'Dago.' Have known appellant two or three years. Appellant shot Mr. Hawks, and I was with him. I talked with appellant the night before Mr. Hawks was killed. He called me and showed me the gun he had, and said it was a good gun to hold a man up with. He said that the two old men down on State street would come by there. He said he had to have money quick. He told me that he wanted me to go with him, as he was going to hold Mr. Hawks up. I went to his house the night, of the killing. Didn't stay there very long, but went back out there to the oil field—the vacant lot between Ash and Beech streets. Appellant left the house with the gun. It was the gun you have showed me. I had nothing on me but a bowie knife and I lost it that night. I showed the knife to appellant at his house be-

fore Mr. Hawks was shot. He picked it up in his hands. We went up to some trees and waited. We were on the trail, and when he said 'halt,' I just kept going. When the gun shot one of them said, 'don't kill my brother,' and I broke and ran. Appellant fired that shot. When I went up to that vacant lot I knew appellant was going to hold up the Hawks brothers, but didn't know I was going to do it—I was just going along with him. He told me the two old men had a store. After that I went on home and didn't see appellant until he came to my house one day that week. He asked me how I felt, and if I had heard anything. He said that if I heard anybody talking they wouldn't talk long—'they won't talk any more.' I never saw appellant after that until I was arrested.''

Other testimony was introduced, including as an exhibit the bowie knife identified by Willie Turner, on which was a finger print (right thumb) of appellant, identified by C. L. Thompson, a member of the Texarkana police department, in charge of the ''finger print and identification bureau.'' We do not think it necessary to show the nature of additional evidence. Such evidence, considered in connection with the confession of Willie Turner and the corroboration by John B. Stewart, was sufficient to warrant the jury in returning its verdict.

Appellant denied that he was guilty. He denied all knowledge of the crime; denied that he was with Willie Turner that night; denied that he talked with John B. Stewart about robbing the Hawks brothers. He undertook to establish an alibi, saying: ''On the night of the killing I stayed at my wife's house at 917 Laurel street —got there about seven o'clock and did not leave the house that night. I know Willie Turner's face when I see him, but I did not make any plans with him.''

In the instant case no motion for a new trial was filed; and, while in capital cases it is not necessary that exceptions be saved, it is essential that objections be made, otherwise the testimony or other matter com-

plained of on appeal will be presumed to have been waived.

Appellant contends that the charge in the information that he committed the crime of murder while attempting to commit robbery is inconsistent with the charge that the crime was premeditated, and that it was committed with malice aforethought.

In *Harris* v. *State,* 34 Ark. 469, it was said: "Where an act itself indifferent becomes criminal if done with a particular intent, there the intent must be proved and found; but where the act is in itself unlawful, the proof of justification or excuse lies on the defendant; and, on failure thereof, the law implies a criminal intent."

There are many cases to the same effect, a more recent one being that of *Brown* v. *State,* 156 Ark. 288, 245 S. W. 813, where it was said: "While it is true as a general rule that every person is presumed to contemplate the ordinary and natural consequences of his acts, such presumption does not arise where the act fails of effect or is attended by no consequences; and where such act is charged to have been done with a specific intent, such intent must be proved, and not presumed from the act."

The definition of murder is: "The unlawful killing of a human being in the peace of the state, with malice aforethought, either express or implied." Pope's Digest, § 2964.

By § 2969 of the Digest it is provided that "All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate, malicious and premeditated killing, or which shall be committed in the perpetration of or in the attempt to perpetrate arson, rape, robbery, burglary or larceny, shall be deemed murder in the first degree."

Although it is true (§ 3837, Pope's Digest) that an indictment, except in the cases particularly excepted, must charge but one offense, yet as to a crime which may have been committed in different modes and by different means, the indictment may allege the modes and means in the alternative. The appellant in *Franklin*

v. *State,* 153 Ark. 536, 240 S. W. 708, was charged with having murdered Thomas N. Mann "by striking him on the head with a certain blunt instrument, and by shooting him with a certain gun." It was insisted, on appeal, that the crime of murder in the first degree was not sufficiently charged in the indictment. The opinion says: "It is true the methods are charged in the conjunctive, but there is nothing in our statutes prohibiting them being charged in the conjunctive if consistent. In other words, if the murder resulted from several acts consistent with each other, all the acts might be charged in the conjunctive and embraced in one count. Mr. Bishop, in his work on New Criminal Procedure, vol. 1, § 43, enunciates the doctrine in the following language: 'Some single offenses are of a nature to be committed by many means, or in one or another of several varying ways. Thereupon a count is not double which charges as many means as the pleader chooses, if not repugnant; and, at the trial, it will be established by proof of its commission by any one of them.' The same rule of procedure is announced by Joyce on Indictments, § 401, and in the Standard Enc. of Procedure, vol. 12, p. 516."

Section 3836 of Pope's Digest reads: "No indictment is insufficient, nor can the trial, judgment or other proceedings thereon be affected by any defect which does not tend to the prejudice of the substantial rights of the defendant on the merits."

The phrase "malice aforethought," as quoted with approval in *Gordon* v. *State,* 125 Ark. 111, 187 S. W. 913, Ann. Cas. 1914A, 419, is defined as "The voluntary and intentional doing of an unlawful act, with the purpose, means and ability to accomplish the reasonable and probable consequences of it, done in a manner showing a heart regardless of social duty and fatally bent on mischief, by one of sound mind and discretion, the evidence of which is inferred from acts done or words spoken."

At common law no distinction is drawn between malice and malice aforethought, and such malice in murder is not limited to hatred, ill will, or malevolence, but denotes a wicked and corrupt disregard of the lives and

460

safety of others—a failure to appreciate social duty. See 13 R. C. L. 763; *House* v. *State,* 192 Ark. 476, 92 S. W. 2d 868.

The statutory definition of murder does not include the word "premeditation," but to constitute murder in the first degree, the act must have been perpetrated "by means of poison, or lying in wait, or by any other kind of wilful, deliberate, malicious and premeditated killing." Following the word "killing," as quoted, the disjunctive particle "or" is used—"or which shall be committed in the perpetration of or in the attempt to perpetrate arson, rape, robbery, burglary or larceny."

Premeditation, therefore, is not an essential element which must be alleged and proved when the indictment charges that the crime was perpetrated while the accused was attempting robbery.

The judgment is affirmed.